J-S30002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.I.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1072 EDA 2023 |

Appeal from the Order Entered April 3, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000552-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: M.I.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.F., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1073 EDA 2023 |

Appeal from the Decree Entered April 3, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000027-2023

BEFORE:  BENDER, P.J.E., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:            **FILED OCTOBER 3, 2023**

S.F. ("Mother") appeals from the April 3, 2023 decree granting the petition filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate her parental rights to her daughter, M.I.F., born in May

2021 ("Child").[1]  Mother further appeals from the April 3, 2023 order changing Child's permanency goal to adoption pursuant to Section 6351 of the Juvenile Act (42 Pa.C.S. §§ 6301-6375).  We affirm the termination decree and dismiss the appeal from the goal change order as moot.

We summarize the factual and procedural history as follows.  The family came to the attention of DHS in May 2021, at the time of Child's birth, as a result of mental health and substance abuse concerns related to Mother.  *See* N.T., 4/3/23, at 9.  Specifically, the Community Umbrella Agency ("CUA"), Turning Points for Children, case manager, Michole Allen, testified:

> There was a [General Protective Services ("GPS") report] made regarding Mother.  It was mostly regarding her mental health.  The GPS stated that Mother was making odd statements, such as she's an angel.  And if the child was a boy, she was going to have sex with the child.  There was also an allegation of Mother using marijuana and PCP throughout her entire pregnancy.  The report also stated that she was not receiving any type of prenatal care during her pregnancy.

*Id.*  As a result, DHS obtained protective custody of Child on May 26, 2021.  *See* Order of Protective Custody, 5/26/21.[2]  Upon her discharge from the hospital, Child was placed in foster care, where she has remained.  *See* N.T., 4/3/23, at 9, 36, 66.

---

[1] By separate decree of the same date, the trial court terminated the parental rights of Child's father, J.T. ("Father").  Father did not file an appeal or participate in the instant appeals.  We refer to Mother and Father collectively herein as "Parents."

[2] For purposes of this matter, we cite to the dependency record, when necessary, as it is part of the certified record in this case.

The court adjudicated Child dependent on August 31, 2021, and ordered supervised visitation for Mother. *See* Order of Adjudication and Disposition, 8/31/21. The court established a permanency goal of reunification. *See* Permanency Review Order, 11/30/21, at 1; *see also* Permanency Review Orders, 3/1/22, 5/31/22, 8/29/22, & 1/6/23.[3] In furtherance of reunification, DHS created a single case plan requiring, *inter alia*, Mother to: maintain her mental health, employment, and housing; participate in visitation with Child; comply with CUA directives; and sign all necessary consents. *See* N.T., 4/3/23, at 12.

Throughout the ensuing dependency proceedings, the court conducted permanency review hearings at regular intervals. From November 2021 through August 2022, the court characterized Mother's compliance with the permanency plan as "full" or "substantial" and her progress toward alleviating the causes of Child's placement as "substantial." Permanency Review Orders, 11/30/21, 3/1/22, 5/31/22, & 8/29/22, at 1. In fact, Mother's visitation progressed to unsupervised in March 2022, and overnight in May 2022. *See* Permanency Review Order, 3/1/22, at 2; Permanency Review Order, 5/31/22, at 2; *see also* N.T., 4/3/23, at 13, 40. The court additionally noted the potential for reunification. *See* Permanency Review Order, 5/31/22, at 2; Permanency Review Order, 8/29/22, at 2.

---

[3] The court established a concurrent goal of adoption on January 6, 2023. *See* Permanency Review Order, 1/6/23, at 1.

- 3 -

However, by January 2023, the court described Mother's compliance as "minimal" and progress as "minimal." Permanency Review Order, 1/6/23, at 1. Significantly, after suffering a miscarriage, Mother failed to attend visitation from September 2022 until February 2023, and expressed a desire to execute documentation to voluntarily terminate her parental rights. *See* N.T., 4/3/23, at 13-16. In December 2022, she additionally forwarded Child's social security card and birth certificate, as well as milestone letters for Child, to Foster Mother. *Id.* at 21, 71-72, 113. Despite Mother then indicating that she had an "epiphany" and "wanted reunification," requesting visitation in February 2023, Ms. Allen expressed concerns with Mother's mental health and her relationship with Father. *Id.* at 16-17, 24-25, 63-65. As such, Ms. Allen stated that Child could not be safely reunified with Mother. *Id.* at 26, 35, 63-64.

On January 19, 2023, DHS filed a petition for the termination of parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), as well as a petition for a change of Child's permanency goal from reunification to adoption. The trial court held a hearing on the petitions on April 3, 2023. Mother was present and represented by counsel. The Child, then almost two years old, was represented by a guardian *ad litem* ("GAL").[4] DHS presented

---

[4] Insomuch as Child's legal interests were incapable of ascertainment due to her young age, we find Section 2313(a) satisfied by the representation of Attorney Newton. *See In re T.S.*, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment

*(Footnote Continued Next Page)*

the testimony of Ms. Allen, and Child's foster mother, J.L.E. ("Foster Mother").

Additionally, Mother testified on her own behalf.[5]

By decree dated and entered April 3, 2023, the trial court involuntarily terminated Mother's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Further, by order also dated and entered April 3, 2023, the court changed Child's permanency goal from reunification to adoption. Thereafter, on April 30, 2023, Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[6] This Court consolidated Mother's appeals *sua sponte* on May 17, 2023.

On appeal, Mother raises the following issues for our review:

1. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.[] § 2511(a)(1)?

2. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.[] § 2511(a)(2)?

_____

because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act [(23 Pa.C.S. §§ 2101-2938)]" is satisfied).

We note that Child's GAL argued in favor of termination. ***See*** N.T., 3/20/23, at 82. He, however, did not submit a brief to this Court.

[5] DHS also offered DHS Exhibits 1 through 4, which the court admitted without objection. ***See*** N.T., 4/3/23, at 7-8. Mother proffered Mother's Exhibits 1 through 3, which the court admitted. ***Id.*** at 59, 62.

[6] On May 19, 2023, the trial court filed a Notice of Compliance with Rule of Appellate Procedure 1925(a), dated May 18, 2023, in which it references its reasoning placed on the record.

3. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.[] § 2511(a)(5)?

4. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.[] § 2511(a)(8)?

5. Whether the trial court erred by terminating the parental rights of [Mother] under 23 Pa.C.S.[] § 2511(b)?

6. Whether the trial court erred by determining it to be in … [C]hild's best interest to change the goal from reunification to adoption?

Mother's Brief at 5-6 (cleaned up).

We review involuntary termination orders for an abuse of discretion, which our Supreme Court has explained "is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021). An abuse of discretion in this context exists "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*.

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven

enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we will analyze the court's termination decrees pursuant to Section 2511(a)(1) and (b),[7] which provides as follows:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing

---

[7] This corresponds with Mother's first and fifth issues. Given our disposition herein, we need not address Mother's second, third, and fourth issues. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

> parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In order to establish grounds for termination pursuant to Section 2511(a)(1), "[a] petitioner … must demonstrate by competent, clear and convincing evidence, '[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.'" *C.M.*, 255 A.3d at 363-64 (citation and footnote omitted). While undefined,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*L.A.K.*, 265 A.3d at 592 (internal citations and quotation marks omitted).

Furthermore, "[f]ortitude is required, as a parent must act with 'reasonable

firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *Id.* (citation omitted).

In assessing Section 2511(a)(1), trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). Thus, "even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months…, the court 'must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights].'" *L.A.K.*, 265 A.3d at 593 (citation omitted). The totality of the circumstances includes consideration of the following: "(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b)." *Id.* As explained by our Supreme Court,

"the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving needs and welfare of each individual child in his or her particular circumstances." *Id.*

Instantly, with respect to the determination that DHS satisfied the statutory grounds to terminate Mother's parental rights pursuant to Section 2511(a)(1), the trial court found that Mother evidenced a settled purpose to relinquish her parental claim and failed to perform parental duties for the six months immediately preceding the filing of the termination petition. N.T., 4/3/23, at 128-29. The court stated, "Mother in essence relinquished any parental claim [and] expressed on more than one occasion that she was not in any position, nor does she desire to reunify." *Id.* at 128. The court continued, "There was nothing in the six months preceding the filing of the petitions in this case for either parent to establish that they in any way were trying to establish a parental claim to the child. [T]o the contrary, they failed to perform parental duties." *Id.* at 129.

Mother acknowledges that, while grieving her loss from a miscarriage, she expressed a desire to voluntarily relinquish her parental rights. *See* Mother's Brief at 14. She asserts, however, that in February 2023, she requested to resume visitation and had two visits with Child prior to the subject hearing. *Id.* Mother further argues that she was continuing to engage in therapy, as confirmed by a letter from her therapist, and had maintained housing and employment. *Id.* at 15.

- 10 -

Upon review, we are constrained to agree with the trial court. The record supports the determination that Mother evidenced a settled purpose of relinquishing her parental claim to Child and failed to perform parental duties in the six months immediately preceding the filing of the termination petition in January 2023. As revealed, Mother ceased visitation with Child from September 2022 to February 2023, after suffering a miscarriage. *See* N.T., 4/3/23, at 13-14. During this time, she also did not independently reach out to see Child or inquire as to how Child was doing. *Id.* at 20, 27, 70-72. Mother explained that she was grieving and "at that time [she] believed that was the best decision that a mother could make." *Id.* at 111. She "needed for [C]hild to be in an environment where she got the love and attention that she needed," and that was "safe." *Id.* at 111-12. Ms. Allen confirmed that, until February 2023, Mother exhibited an intent to not reunify with Child. *Id.* at 22, 62-63. Although Foster Mother wanted Mother to remain involved in Child's life, Ms. Allen stated that Mother "wanted to be known as a surrogate." *Id.* at 19.

Indeed, Ms. Allen testified that Mother indicated a desire to sign paperwork voluntarily terminating her parental rights ("VOLs"). Subsequent to advising Mother to consider this decision further, Mother contacted Ms. Allen at the end of October 2022, and reiterated her desire to voluntarily terminate her parental rights, as follows:

> [COUNSEL FOR DHS]: Between September of 2022 and February of 2023, did you speak with Mother?
>
> MS. ALLEN: Yes.

- 11 -

[COUNSEL FOR DHS]: And what was the nature of your conversations with her?

MS. ALLEN: Mother contacted me. And she expressed that she wanted to sign VOLs.

[COUNSEL FOR DHS]: As a result, did you have VOLs drafted?

MS. ALLEN: Not until November.

[COUNSEL FOR DHS]: Why did you wait to have them drafted until November?

MS. ALLEN: I informed Mother that I thought she was making an impulsive decision. I told her that after suffering the miscarriage, I really believe that she needed to take time to just grieve her los[s] and consult with her therapist.

And then I told her, you know, after you consult with your therapist, after you take some time, contact me. And we'll talk again. Mother contacted me at the end of October of 2022.

And she stated, "Remember you told me that I should take time to think about signing VOLs?" I stated, "Yes." She stated, "Well I still want to sign the paperwork."

*Id.* at 15-16.

Moreover, in December 2022, after contacting Foster Mother for her address, Mother sent Child's social security card and birth certificate, as well as milestone letters for Child, to Foster Mother. *Id.* at 21, 71-72, 113. Foster Mother corroborated that Mother did not want reunification at that time. She testified, "[Mother] told me to take care of [Child], not to worry about her. She told me, during the conversation when she asked for my address, that that would be the last time that she would call." *Id.* at 72-73. As such, and of significance, Ms. Allen recognized that Mother "had not taken steps to take and maintain a place of importance in [Child]'s life" from September 2022 to February 2023. *Id.* at 26.

- 12 -

Once Mother requested visitation in February 2023, she was offered and participated in two supervised visits prior to the subject hearing, one in February and one in March 2023. *Id.* at 17-18.[8] As recounted by Ms. Allen, Mother did not request for such visitation to be expanded. *Id.*

While Mother never executed documentation to voluntarily terminate her parental rights and subsequently expressed a desire for reunification and re-engaged in visitation, given Mother's clear desire to relinquish her parental role and failure to perform parental duties in the six months immediately preceding the filing of the termination petition, we discern no abuse of discretion in the court's finding grounds for termination pursuant to Section 2511(a)(1). Hence, we do not disturb it.

Having found sufficient grounds for termination pursuant to Section 2511(a)(1), we next must determine whether termination was proper under Section 2511(b), which affords primary consideration to the developmental, physical and emotional needs and welfare of the child. *See T.S.M.*, 71 A.3d at 267. "[T]he determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond." *Id.* (internal citations omitted). As our Supreme Court recently explained in *Interest of K.T.*, 296 A.3d 1085,

---

[8] When asked about the visitation schedule, Ms. Allen explained, "Because there was no visitation order in the last [c]ourt order from January; she had one visit in February and one visit in March." N.T., 4/3/23, at 17.

- 13 -

1113 (Pa. 2023), "a court conducting a Section 2511(b) analysis **must consider more than proof of an adverse or detrimental impact** from severance of the parental bond. We emphasize analysis of the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." **K.T., supra** (emphasis added).

In addition, the **K.T.** Court held that the "Section 2511(b) inquiry must also include consideration of other important factors." **Id.** While not inventing an exhaustive list of considerations, the Court explained that the inquiry **must consider and weigh** certain evidence **if it is present in the record**, including, but not limited to, "the child's need for permanency and the length of time in foster care…; whether the child is in a pre[-]adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." **Id.** (footnote omitted); **see also id.** at 1113 n.28.

In concluding that termination of Mother's parental rights best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), the trial court stated:

> With regards to [Section] 2511(b), this court finds that Child does not have a parental bond with either Mother or Father in this case. Even if Child recently recognized Mom at one of the two visits that she had this year, there is no indication of a parent/child bond.

The last visit -- I believe the testimony was that the visit in March ended early after [C]hild -- Mom said Child was exhausted. The testimony from the CUA worker is that Child didn't want to even interact with Mom and put a toy in-between [her and] Mother. There is no indication of a parent/child bond, which would be impossible for Parents to have given their lack of contact with Child during Child's life.

Due to the lack of visitation, it would have been impossible for Parents, given that they did not avail themselves for more visits, to establish a parental bond. I find that Child would suffer no irreparable harm if the rights of Parents were terminated, as Child has been having all of [her] needs met by [Foster Mother], who has been there for this [C]hild.

I am heartened by the fact that [Foster Mother], and I hope that Parents will avail themselves of this, [does] not want to eliminate Parents from Child's life. I would encourage Parents to avail themselves of [Foster Mother's] willingness to have them participate in Child's life.

This is not something that happens every day when we're in this situation in court. And I would encourage Parents to avail themselves so they can continue to be present in Child's life. But I do find at this time it's in Child's best interest to change the goal to adoption, as Child has been in the same home since Child was four days of age. Child's needs are being met by [Foster Mother].

Child has not -- [Parents do not] meet any of Child's needs. And I find that Child, at this young age, it's very important for Child to have permanency. This is a child, it should be noted, that has special needs and is receiving various types of therapies that Parents are not familiar with.

They don't know where Child is receiving the therapy at this point. There was no testimony that they would be able to care for Child. And I find that it would be in Child's best interest to free Child for adoption.

N.T., 4/3/23, at 133-35 (cleaned up; internal punctuation and capitalization also corrected).

Conversely, in arguing a lack of clear and convincing evidence that termination of Mother's parental rights best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b), Mother baldly asserts that she wants to visit with Child and reestablish a bond. *See* Mother's Brief at 19.

Upon review, the record supports the finding that termination favors Child's needs and welfare under Section 2511(b). Mother's visitation with Child progressed to unsupervised visitation in March 2022, and then to overnight, weekend visitation in May 2022. *See* N.T., 4/3/23, at 13, 40; Permanency Review Orders, 3/1/22 & 5/31/22. Ms. Allen acknowledged that, "to her knowledge," such visitation was "appropriate." N.T., 4/3/23, at 40. However, Mother then ceased participation in visitation in September 2022, after suffering a miscarriage. N.T., 4/3/23, at 13. While Mother resumed supervised visitation in February 2023, Ms. Allen raised the following concerns:

> [COUNSEL FOR DHS]: Since September of 2022, how many visits had [Mother] had with [Child]?
>
> MS. ALLEN: The two in 2023; the one in February and the one in March.
>
> [COUNSEL FOR DHS]: And at this time, would you have concerns recommending any sort of unsupervised contact with [Child]?
>
> MS. ALLEN: Yes.
>
> [COUNSEL FOR DHS]: And what are those concerns?
>
> MS. ALLEN: [Child] is no longer familiarized with her mother. At the last visit, [Child] wouldn't even engage in the visit unless Ms. [C.], who is [Foster Mother]'s aunt, unless she was in the visitation

room.  When Ms. [C.] tried to walk out the room, [Child] began crying, screaming.  She wouldn't let Mother touch her.  So she was asked to stay inside.  [Child] would not interact with her mother throughout the visit.  She actually put a toy in-between the two of them to separate them.

*Id.* at 18.

Significantly, Mother failed to engage in visitation with her young child for a period of five months, from the time Child was 16 months old until almost two years old.  As such, despite any prior visitation and contact, Ms. Allen opined that a parent-child bond did not exist between Mother and Child.  *Id.* at 35-36.  She testified that Child "is just not comfortable" with Mother and would not suffer any irreparable harm if Mother's parental rights were terminated.  *Id.* at 26-27.

Instead, Ms. Allen indicated that Child "is very much bonded with the family, with [Foster Mother] and her aunt" and looks to Foster Mother for her "daily parental needs."  *Id.* at 37-38.  Notably, Child had been in her current pre-adoptive foster home since she was four days old.  *Id.* at 37, 66, 79-89.  Ms. Allen described, "[Child] is very playful with [Foster Mother].  She's very attached to her."  *Id.* at 37.  Foster Mother further observed, "[Child] is a very, very happy little girl."  *Id.* at 78-79.

Moreover, Foster Mother testified that Child has gross motor delays and did not believe that Mother would be able to care for her.  She stated, "[Child] has gross motor delays.  She is not able to walk.  … In addition to physical therapy, she does receive occupational therapy and speech therapy.  … And

- 17 -

just the care that she requires, I'm not sure if [Parents] would be able to do it." *Id.* at 79.

Based upon the foregoing, we conclude that the record corroborates the trial court's determination that termination of Mother's parental rights best serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). As such, we do not disturb it. Since our review confirms that there was a sufficient basis for the involuntary termination of Mother's parental rights pursuant to Section 2511(a)(1) and (b), we affirm the trial court's decree.

Given our disposition concerning termination, Mother's appeal from the goal change order is moot. *See In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa. Super. 2020) (citing *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002)) ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees.").[9]

For the foregoing reasons, we affirm the termination decree and dismiss the goal change order as moot.

Decree affirmed. Appeal from goal change order dismissed as moot.

_____

[9] Even if not moot, for the reasons we have already discussed throughout this memorandum with respect to termination, the record confirms that changing Child's goal to adoption is in her best interest. *See In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011).

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/3/2023